In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2778

RONALD P. ORTH and EUFEMIA B. ORTH,

*Plaintiffs-Appellees*,

*v.*

WISCONSIN STATE EMPLOYEES UNION,
    COUNCIL 24, and GROUP INSURANCE PLAN
    WISCONSIN STATE EMPLOYEES UNION,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-149—**William C. Griesbach**, *Judge*.

ARGUED MAY 7, 2008—DECIDED OCTOBER 22, 2008

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*.  The plaintiffs in this suit under both ERISA and the Taft-Hartley Act charge the defendants, an employer and a welfare benefits plan, with having violated provisions of an ERISA plan contained in

a collective bargaining agreement between the employer (Council 24 of the Wisconsin State Employees Union) and the union that represented Mr. Orth. The district judge granted summary judgment for the plaintiffs and also awarded them their attorneys' fees. The appeal requires us to consider, among other things, the circumstances in which extrinsic evidence can be used to demonstrate the existence of a "latent" ambiguity in a contract that is clear on its face and the requirements for a valid modification of a contract in general, and an ERISA plan in particular, by subsequent dealings between the parties. These issues are to be resolved in accordance with federal common law. E.g., *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 465-66 (7th Cir. 1998).

The collective bargaining agreement in force when Orth retired required the employer to provide health insurance to current and retired employees. If upon retirement an employee had unused sick leave, the monetary value of that leave would be used to pay the insurance premiums "on the same basis as the benefit is currently paid for employees." The reference is to a provision in the collective bargaining agreement that the employer "will pay 90% of the total premium while the employee pays 10% of the total premium."

When he retired in 1998, Orth had more than $42,000 in accrued sick leave. Eight years later his former employer told him that the entire amount had been or was about to be completely used up in payment of his share of his health insurance premiums. The reason, it turns out, is that contrary to the language of the collective

bargaining agreement that we quoted, the welfare benefits plan was deducting not 10 percent but 100 percent of the retired employees' health insurance premiums from their sick-leave accounts.

The defendants admit that the language of the agreement is clear "on its face"; that is, no one who just read the agreement would think there was any uncertainty about the share of health insurance premiums that a retired employee would be responsible for: 10 percent. But sometimes a contract is clear on its face yet if you knew certain background facts you would realize that it was unclear in its application to the parties' dispute. The best exemplar of the principle remains *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864). The plaintiff agreed to sell the defendants a quantity of cotton, at a specified price, to be shipped from Bombay to Liverpool by a ship called *Peerless*. Nothing unclear there. But it happened that there were two ships named *Peerless* sailing from Bombay to Liverpool a few months apart. The cotton was shipped on the second *Peerless*, and the defendant—the price of cotton having fallen in the interim—argued that it should have been shipped on the first one. A.W. Brian Simpson, "Contracts for Cotton to Arrive: The Case of the Two Ships Peerless," 11 *Cardozo L. Rev.* 287, 319-21 (1989). Nothing in the contract indicated which ship *Peerless* the parties had agreed that the cotton would be shipped on, and the court ruled therefore that the contract was hopelessly ambiguous—though perfectly clear on its face.

At some point in the administration of the collective bargaining agreement in the present case, the plan started

deducting 100 percent of retired employees' insurance premiums from their sick-leave accounts. Two retired employees besides Orth were subjected to such deductions. They did not complain, but on the other hand they had never been told that 100 percent rather than 10 percent of the premiums were being deducted and so far as appears they never discovered the fact on their own. There is also evidence that the employees' union knew what the plan was doing but did not object. And a subsequent collective bargaining agreement, though inapplicable to the Orths' claim, changed the employee's share from 10 percent of premiums to a combination of zero percent of premiums for single coverage and 100 percent of the difference between the premiums for single coverage and family coverage. This change was proposed by the union and for all we know made most employees better off, but probably not the Orths. Both Orths were reimbursed under their retirement plan for 90 percent of their health insurance premiums; the new provision would reimburse all of Mr. Orth's premiums but none of his wife's.

All this evidence, however it might bear on the defendants' alternative argument that the contract on which the Orths are suing was modified by subsequent dealings between the union and the employer, has no force in establishing a latent ambiguity. Indeed, we cannot see how the same evidence could support both arguments. In a case of latent ambiguity, the contract is seen, once its real-world setting is understood, to have never been clear; in a case of modification, the contract was clear when it was made but was later changed. After the extrinsic evidence was presented in the *Raffles* case, it was

apparent that the ambiguity in the word "Peerless" could not be cured because the contracting parties had not agreed on which "Peerless" the cotton was to be shipped on. After all the extrinsic evidence is weighed and parsed in this case, the contract remains unambiguous. The defendants' argument is not that the contract does not mean what it says but that it is not the contract. That argument has nothing to do with ambiguity, so we turn to the question of modification by subsequent dealings.

An ordinary contract can be modified by subsequent dealings that give rise to an inference that the parties agreed, even if just tacitly, to the modification ("acqui-esced," as the cases say, though "agreed" is clearer). E.g., *Cromeens, Holloman, Sibert, Inc v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003); *Operating Engineers Local 139 Health Benefit Fund v. Gustafson Construction Corp.*, 258 F.3d 645, 649 (7th Cir. 2001); *International Business Lists, Inc. v. American Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998); *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 440 (4th Cir. 2001); see *Restatement (Second) of Contracts* § 202(4) (1981). But because ERISA plans must be "maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), only modifications of such plans in writing are enforceable, and so it would seem that the principle that contracts can be modified by the subsequent conduct of the parties is inapplicable to ERISA plans unless the conduct is proved by a writing.

The common paraphrase of section 1102(a)(1) is that "ERISA plans must be in writing and cannot be modified orally." *Livick v. Gillette Co.*, 524 F.3d 24, 31 (1st Cir. 2008);

see, e.g., *Nachwalter v. Christie,* 805 F.2d 956, 960 (11th Cir. 1986). But the two clauses don't fit together; the accurate paraphrase is that because a plan must be maintained pursuant to a writing, it can be modified only in writing. Modification by conduct is tacit, and therefore (unless evidenced by a writing) unwritten, like oral modification; why should it matter that it is nonverbal? The statutory requirement "that the plan be in writing is thought to carry over to this 'procedure for amending such plan,' hence to mean that plan amendments must be in writing." John H. Langbein, Susan J. Stabile & Bruce A. Wolk, *Pension and Employee Benefit Law* 690 (4th ed. 2006). That would exclude modification by subsequent dealings not confirmed in writing.

The refusal of this and other courts to hold that promissory estoppel can never be used to vary an ERISA plan may seem inconsistent with requiring that all modifications be in writing. But as we explained in *Miller v. Taylor Insulation Co.*, 39 F.3d 755, 758-59 (7th Cir. 1994), the main objection "to oral modifications [of ERISA plans] is that they would enable the plan's integrity, and possibly its actuarial soundness, to be eroded by relatively low-level employees who in response to inquiries about the scope of coverage advise participants that a particular medical procedure is covered, even though the plan is explicit that it is not covered. This concern is diminished when the doctrine [of promissory estoppel] is used to prevent an employer from denying that an employee (or as in this case a former employee) is a participant in the plan. Assurances that one is a participant, as distinct from assurances concerning the plan's coverage of a particular

medical procedure, are unlikely to come from low-level employees, and did not in this case" (citations omitted). In the present case, even more clearly, there is no danger that departing from the literal terms of the plan would undermine its actuarial soundness, for the departure is sought in order to reduce the plan's liability.

But the statutory requirement that a modification of an ERISA plan be in writing is not limited to cases in which departures might deplete the plan's assets, important as those cases are. See, e.g., *Shields v. Local 705, Int'l Brotherhood of Teamsters Pension Plan*, 188 F.3d 895, 903-05 (7th Cir. 1999) (concurring opinion). In most of the relatively few cases in which estoppel, whether promissory or equitable, has been allowed to vary the terms of the written plan, the claim of estoppel was itself based on a writing (for example, a written promise)—and we have deemed that element essential. *Kamler v. H/N Telecommunication Services, Inc.*, 305 F.3d 672, 679 (7th Cir. 2002); *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000); *Schmidt v. Sheet Metal Workers' National Pension Fund*, 128 F.3d 541, 546 (7th Cir. 1997). The application of the writing requirement to modification by a subsequent course of dealings is implicit in *Schoonmaker v. Employee Savings Plan of Amoco Corp. & Participating Companies*, 987 F.2d 410, 413-14 (7th Cir. 1993), and *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241 (2d Cir. 1989); cf. *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1149-50 (7th Cir. 1989) (en banc). We now make it explicit.

But we must consider the bearing of the fact that the ERISA plan was created by a collective bargaining

contract, see, e.g., *Matuszak v. Torrington Co.*, 927 F.2d 320, 321, 323-24 (7th Cir. 1991), and such contracts can be and often are modified by a subsequent nonwritten agreement—whether express (and therefore oral) or tacit (and therefore evidenced by subsequent dealings)—between the union and the employer. E.g., *id.* at 321, 323-24 (7th Cir. 1991); *Railway Labor Executives Ass'n v. Norfolk & Western Ry.*, 833 F.2d 700, 705 (7th Cir. 1987); *Mohr v. Metro East Mfg. Co.*, 711 F.2d 69, 71-73 (7th Cir. 1983); *American Federation of Musicians, Local 2-197 v. St. Louis Symphony Society*, 203 F.3d 1079, 1080 (8th Cir. 2000); *Sanderson v. Ford Motor Co.*, 483 F.2d 102, 111-12 (5th Cir. 1973); but cf. *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 753-54 (6th Cir. 2003). Must the employees consent for the modification to be effective? There is no indication that the two employees who allowed an additional 90 percent of their health insurance premiums to be deducted knew they were being short-changed (even if the union did, and acquiesced, of which there is some evidence, as we said). But employees are not signatory parties to the collective bargaining agreement, *Plumbers' Pension Fund, Local 130 v. Domas Mechanical Contractors, Inc.*, 778 F.2d 1266, 1269 (7th Cir. 1985); *H. K. Porter Co. v. Local 37, United Steelworkers of America*, 400 F.2d 691, 694 (4th Cir. 1968), and although they are third-party beneficiaries, *International Brotherhood of Electric Workers v. Hechler*, 481 U.S. 851, 863-65 (1987); *Mohr v. Metro East Mfg. Co., supra*, 711 F.2d at 72; *Anderson v. AT&T Corp.*, 147 F.3d 467, 473 (6th Cir. 1998), the rights conferred by that status are not identical to those of express parties. The prevailing although not unanimous view is that the

signatory parties can alter the contract (unless it provides otherwise) even to the detriment of a third-party beneficiary unless the latter, learning that he is a third-party beneficiary, relies to his detriment on his rights under it. *Restatement, supra*, §§ 311(2)-(3); see E. Allan Farnsworth, *Farnsworth on Contracts* § 10.8 (4th ed. 2004).

This principle is modified somewhat in the collective bargaining context. Although, as we said, the contract can be modified by agreement between the union and the employer without the employees' consent, the union has a duty of fair representation. The breach of that duty is illustrated by *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1140-43 (2d Cir. 1994), where, much as in this case, the union's agent concealed from the union's members an oral agreement that he had made with the employer. See also *Bennett v. Local Union No. 66, Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, 958 F.2d 1429 (7th Cir. 1992); *Merk v. Jewel Food Stores Division*, 945 F.2d 889, 894 (7th Cir. 1991); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1468-70 (10th Cir. 1993). The plaintiffs in our case do not allege a breach of fair representation by the union, as they are entitled to do in a suit to enforce rights under a collective bargaining agreement, which this suit in part is. But the omission turns out not to matter. The plan fiduciaries are to the plan participants and beneficiaries as the union is to the workers it represents; the union too is a fiduciary, and its duty of fair representation is simply another name for "fiduciary duty." Welfare plans normally and in this case do not create vested rights; they can be changed without the consent of the participants and beneficiaries. *Hughes*

*Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). But just as in the collective bargaining setting, it is a breach of fiduciary duty to change the plan without notice to those affected by the change. *Smith v. National Credit Union Administrative Board*, 36 F.3d 1077, 1081 (11th Cir. 1994). It is also a statutory violation; a plan's participants and beneficiaries must be notified in writing of all modifications to the plan. 29 U.S.C. § 1024(b)(1); *Godwin v. Sun Life Assurance Co. of Canada*, 980 F.2d 323, 327 (5th Cir. 1992). Without knowledge of their rights under the plan, participants cannot make intelligent decisions with regard to the purchase of private health insurance to replace or supplement their plan benefits. The secret side deal between the union and the employer in this case was a breach of the plan managers' fiduciary duty to the plan participants and beneficiaries. So it is doubly unlawful—as unwritten and as secret.

That completes our discussion of liability. But the defendants also quarrel with the award of damages. They say the judge should not have awarded the plaintiffs the cost of the premiums that the plaintiffs had to pay in order to keep their health insurance in force after the plan wrongfully emptied Orth's sick-leave account. It is true that consequential damages cannot be recovered in a suit under ERISA. *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148 (1985); *McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 429-30 (7th Cir. 2005). Had the Orths paid higher premiums to another health insurer, they could not recover the difference between those premiums and the premiums the collective bargaining

agreement required the plan to pay. *Zielinski v. Pabst Brewing Co., Inc.*, 360 F. Supp. 2d 908, 922-23 (E.D. Wis. 2005). But all they are seeking is the premium reimbursement to which the contract entitles them.

The defendants challenge the district judge's awarding attorneys' fees to the plaintiffs. They argue that the judge was mistaken to think that there had been no reasonable basis (or, equivalently, as the Supreme Court noted in *Pierce v. Underwood*, 487 U.S. 552, 565-66 (1988), "substantial justification") for the defendants' position. *Herman v. Central States, Southeast & Southwest Areas Pension Fund*, 423 F.3d 684, 696 (7th Cir. 2005); *Production & Maintenance Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1404 (7th Cir. 1992); *Cline v. Industrial Maintenance Engineering & Contracting Co.*, 200 F.3d 1223, 1236 (9th Cir. 2000). The judge made no mistake. No careful lawyer could have thought this a case of latent ambiguity or valid modification. And for the defendants to use their deceptive conduct toward the retired employees as a basis for trying to duck liability was shabby. The only questionable aspect of the district judge's opinion is his statement that the defendants were acting throughout in good faith.

The defendants complain finally about the amount of attorneys' fees awarded to the plaintiffs—nearly $41,000. That is almost as much as the plaintiffs' remedial award, which consisted of $36,000 restored to Mr. Orth's sick leave account ($40,000 minus 10 percent) plus $7,200 in premium reimbursement. Even if the attorneys' fee award had exceeded the plaintiff's remedial award

(which it may have done, since the sick leave account is merely a credit against insurance premiums not yet charged), the disproportion would not necessarily matter. For the general principle, see *City of Riverside v. Rivera*, 477 U.S. 561, 580-81 (1986); *Molnar v. Booth*, 229 F.3d 593, 605 (7th Cir. 2000); *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 592 (7th Cir. 2000), and for its application to ERISA see *United Automobile Workers Local 259 Social Security Dept. v. Metro Auto Center*, 501 F.3d 283, 292-93, 296 (3d Cir. 2007); *Building Service Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995).

There are fixed costs of litigation, and they prevent a plaintiff from scaling down his expenses proportionately to the stakes. *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, *supra*, 223 F.3d at 592. One purpose of allowing an award of attorneys' fees to a prevailing plaintiff is to disable defendants from inflicting with impunity small losses on the people whom they wrong. Cf. *Hyde v. Small*, 123 F.3d 583, 585 (7th Cir. 1997). Accomplishing that purpose will often require a fee award equal to or larger than the damages awarded.

AFFIRMED.